In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-21-00224-CV
_____


IN THE INTEREST OF L.B., L.B., K.B., AND K.B.


On Appeal from the 317th District Court
Jefferson County, Texas
Trial Cause No. F-237,899


MEMORANDUM OPINION

After a bench trial, Appellant R.B. ("Ronald") appeals the trial court's order terminating his parental rights to his children, L.B. ("Linda"), L.B. ("Lonnie"), K.B. ("Katie"), and K.B. ("Kenny").[1] The court also terminated the parental rights of the

---

[1] To protect the identities of the minors, we use pseudonyms to refer to the children and their parents. *See* Tex. R. App. P. 9.8(b)(2). Appellant's notice of appeal and brief include only three of the children's initials in the case style, but we interpret his brief to apply to all four children that are subjects of the termination order.

1

children's mother, A.O. ("Annie").[2] For reasons explained herein, we affirm the trial court's judgment.

## Background

On September 3, 2020, the Department of Family and Protective Services ("the Department") filed an Original Petition for Protection of a Child, For Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship. The petition named Linda, Lonnie, Katie, and Kenny as the children, Annie as the children's mother, and Ronald as the children's father. At the time the petition was filed, Linda was eleven years old, Lonnie was nine years old, and Katie and Kenny were five years old.

## Evidence at Trial

Testimony of CPS Caseworker

The CPS Caseworker assigned to the case testified that the children came into the care of the Department after law enforcement received a report and appeared at Ronald's home and found there was no water or electricity after a hurricane, the children were left unsupervised for a long time, and the children were given keys to the car to sit in it to get air conditioning. At the time, Ronald and his girlfriend had been arrested for trespassing. During an investigation and during the Caseworker's

---

[2] Although the Department's brief asserts Annie raised the same appellate issues as Ronald, we note that Annie is not a party to this appeal. Accordingly, we include limited details about her as necessary to explain the facts.

2

conversations with the children, the children expressed that they had limited access to food and that food would be locked away and kept from them. According to the Caseworker, other family members of the children had reported concerns about the living conditions in the home. The Caseworker testified that it was her understanding that when CPS responded the children were not clean. The Caseworker testified that she learned that when the children were at home, Ronald and his girlfriend would disappear for hours at a time and sometimes all day and that when they would return, they would either use drugs and pass out or cook food for themselves and lock up the rest of the food without feeding the children. The Caseworker testified that she was told that Ronald's girlfriend would tell the children that there was a camera in the refrigerator and she and Ronald would know if they tried to get into the refrigerator. It was also reported to the Caseworker that when Ronald and his girlfriend dropped the children off to her, the children were underfed and not clean. The Caseworker testified that she was informed that Lonnie had been diagnosed with a medical condition, Ronald and his girlfriend had been overmedicating Lonnie, and Ronald and his girlfriend were not taking Lonnie to his follow-up appointments.

At the time of removal, attempts to contact Annie, the children's mother, were unsuccessful. According to the Caseworker, Annie's home had burned the previous year, she was living in a travel trailer, and the children had been living with their father for the past year. The Caseworker testified that Ronald and Annie had a

previous history with CPS from 2018 in which Annie admitted she used marijuana and methamphetamine and Ronald admitted to drug abuse issues and crack cocaine use.

The Caseworker testified that at the time of trial the children had been in the Department's care for over nine months, the court had ordered a plan of service for the parents to remedy the effects of abuse or neglect that were happening in the home, and she would discuss monthly with Ronald the tasks that needed to be completed on his service plan. One of the requirements of the plan was that he maintain a home with working utilities and that the home needed to be safe and drug free. According to the Caseworker, Ronald owns the home that was given to him by his father, and through virtual visits she conducted she was able to determine that the home had working utilities and no safety hazards. The Caseworker testified that "as far as me being able to assess whether the home was drug free, [Ronald] has submitted to drug tests; and for the positive drug screen he did eventually provide me proof of medication." The Caseworker testified that she asked him for proof of his hydrocodone prescription. The Caseworker testified that Ronald was unable to submit to drug testing in the area because he was working out of town. The Caseworker testified that she ordered a hair follicle drug test at one point, but that Ronald did not have enough hair for them to do the test. According to the Caseworker, Ronald had been working in a lot of different places and had expressed

4

that he had not had consistent work due to Covid, and she did not believe if the children were returned home that the children would be appropriately supervised. Ronald provided his pay stubs to the Caseworker the day prior to trial, but he only provided pay stubs for a couple of weeks for a job in Houston, and he provided employment information for the job he was working in Oklahoma at the time of trial. The Caseworker testified that at the time of trial Ronald still had the same girlfriend and that both Ronald and the girlfriend had left his children alone with food locked up and that the younger children had to take care of Ronald's girlfriend's older child who has special needs and aggressive tendencies. The Caseworker testified that Ronald completed his parenting classes as part of his service plan, and she was provided proof of completion. The Caseworker testified that Ronald's visits with the children were sporadic and "ha[d] not been significant[]" over the last nine months, which she assumed was due to his work schedule. The Caseworker testified that Ronald completed a drug assessment that recommended that he attend online Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) meetings. Ronald completed a psychosocial evaluation and it was recommended that Ronald attend counseling. According to the Caseworker, Ronald did not provide proof that he attended AA or NA, and when they spoke about counseling sessions, he told her that work would prevent him from participating in those sessions. He also did not provide

proof that he attended the parent support group meetings as recommended in the parenting plan.

The Caseworker testified that Annie and Ronald both knowingly placed or allowed the children to remain in conditions or surroundings which endangered their physical and emotional well-being and engaged in conduct and placed the children with persons who engaged in conduct that endangered the children's physical and emotional well-being. The Caseworker testified that Annie and Ronald both constructively abandoned the children, as the children had been in the temporary managing conservatorship of the Department for not less than six months, that the Department had made reasonable efforts to provide services to return the children, and that Annie and Ronald had not maintained significant contact with the children and had not shown that they have a safe, stable environment to provide for the children.

The Caseworker testified that the initial goal in the case was family reunification, but the goal changed to relative adoption during the permanency conference the month prior to the permanency hearing. According to the Caseworker, the four children are currently placed with their maternal aunt and are doing well in their current placement. She testified that the children have adjusted well because they are familiar with their aunt's home because they had gone to live there whenever the parents had their drug problems or were in jail. She testified that

6

the children had gained weight, were included in family outings, and appeared to be very happy and well taken care of in the aunt's home. The Caseworker testified that the oldest child, Linda, had expressed to her every visit since the case began that she loved her parents, but she preferred to live at her aunt's house because the children are comfortable there, they have lived with their aunt off and on, and they are supervised there. The Caseworker testified that Linda wrote a letter to the trial court describing how she felt and where she thought she and her siblings should be, and that she was "beside herself with worry and fears that she's going to have to go home." According to the Caseworker, Lonnie, the oldest son, told her at the beginning of the case that he also preferred to live with his aunt. The Caseworker testified that during the case she learned from the two younger children that their mother had told them to tell the judge that they wanted to go home. The Caseworker acknowledged that she had not had the opportunity to see the children interact with their parents, but that early in the case the children told the Caseworker that they loved staying at their aunt and uncle's house and were okay with living there. The Caseworker testified that the children told her that they had stayed off and on frequently with their aunt and uncle, and the Caseworker believed they felt safe and protected there. The Caseworker testified that at the aunt and uncle's house the children had their own beds, ate, took baths, and had transportation to school and the doctor. The Caseworker testified that the children's aunt spent "almost every day of

7

every week" getting the children to doctor appointments and checkups, and that they were being appropriately cared for and appropriately fed. The Caseworker testified that she believes the children should be allowed to stay at their aunt's so that they can have the stability they need.

Testimony of the Aunt

Annie's sister, the children's aunt, testified that the children had been in her care since their removal on August 29, 2020. When the children were removed and the aunt arrived at Ronald's home, law enforcement informed the aunt that the children needed to be fed, and the aunt thought they appeared hungry. According to the aunt, the children "grabbed [her] and hugged [her,]" and were glad to see her.

The aunt testified that in the past, the children, their mother, and their father had lived with her, and "they have been in and out of my home." She testified that the children's parents had a history with CPS "but it never was like this situation." According to the aunt, CPS became involved in 2018 due to Annie's and Ronald's drug use, and CPS told Annie that if she left the children with the aunt, the case would be dropped, so Annie left the children with her. After six months the aunt returned the children to Annie because Annie "seemed to be doing good[.]" The aunt testified that she also had the two older children before the younger two children were born and when Annie was in jail, and that Annie had lived with her "on and off their whole life." According to the aunt, since the beginning of the case, Ronald has

only provided minor financial assistance and had not financially provided for the children's daily needs except he paid for one of the children's cell phone service for a while, and one month when he was on food stamps, he gave the aunt a card that she used to buy about $250 in groceries for the children. The aunt testified that Ronald had drug problems before 2011 or 2012 and, to her knowledge, he had not had a problem with drugs since then.

The aunt testified that the children had a stable home when Ronald and Annie were together, and that the children had a stable home when they lived with Ronald "until this happened." According to the aunt, her desire was not to testify to say negative things about Ronald or Annie, but she provided her testimony "for the children" and wished that Ronald's and Annie's situations were better.

The aunt testified that she and her husband had been married for twenty years and had a stable home with room for the four additional children. They also had an eighteen-year-old son and a pregnant sixteen-year-old daughter living in their home. The aunt testified that she believed her sister's four children were receiving a more stable home, with more consistent food, shelter, and education in the aunt's home than in the home of either parent. While in her care, she took Lonnie to Texas Rheumatology Center at Texas Children's Hospital and learned that his parents had been giving him too high of a dosage of his medication for his condition that involves chronic inflammation, but the aunt testified that she did not think it was purposeful

but that it was instead a miscommunication about the dosage. The aunt testified that she did learn at the visit that there were several missed appointments and lab appointments while Lonnie was in his parents' care. The aunt testified that doctors informed her that Lonnie's condition can be serious and even deadly, and the aunt believed it was an important part of her job caring for him to make sure he received the proper dosage of medicine and proper medical care. According to the aunt, since coming into her care, Lonnie's condition had been stable, and he had been without pain or inflammation. The aunt testified that it would help if she could qualify for adoption subsidies to help take care of the children and for them to go to college.

According to the aunt, she believed Ronald and Annie love their four children, and she agreed that at the time of the children's removal no one's homes in the area had electricity or water, including hers, because of the hurricane. The aunt testified that the children were good students. The aunt testified that Linda was upset and scared because she did not know what the judge was going to do, and the aunt believed Linda would not have a good reaction if the judge sent her home with her mother and father.

Testimony of Annie

Annie testified that the children had been in her care all their lives except for when she went to rehab and also about a year earlier when she and Ronald agreed after her house burned that the children would live with him because he was in a

10

better position to care for them. While Annie appreciated the care her sister had provided for the children, Annie testified that she had raised the children, she was the reason they were well mannered and well educated, and she wanted the children back in her care. Annie testified that she had voiced concerns to her sister, brother-in-law, and mother about Ronald's girlfriend's special needs child playing too rough with her children and concerns about how her children were being treated and disciplined because she did not know Ronald's girlfriend well.

Linda's Letter to the Trial Court

Linda, the oldest child, wrote letters to the trial court which were admitted into evidence. In the letters she stated that she desired to stay at her aunt and uncle's house, that she loved her parents but they "mentally and emotionally hurt [her] every day[,]" and she "could never go back to how much [she] and [her] siblings got hurt[,]" she and her siblings loved living with their aunt and uncle, they were getting fed and cared for at their aunt and uncle's house, they "always got left alone at [her] mom's and dad's for long periods of time[]" and at her father's "he locked the pantry so [they] had no way to get food[,]" her father had only visited them twice, they had not seen their father in five months and when in town he did not even stop by, their aunt and uncle's is a "special place" where she and her siblings "belong[]" and are safe, her father's girlfriend's son was violent toward the four children and they were scared of him and would be left alone with him, and she wanted to stop moving from

11

place to place because she wanted to get a good education so she could become a nurse.

Other Evidence at Trial

The Clinical Management for Behavioral Health Services notes from the Burke Center were admitted into evidence and stated that Ronald reported starting smoking marijuana at age nine, cocaine at age fifteen, and alcohol at age twenty-two. He reported having a cocaine problem from 2005 through 2010, and he started to get clean in 2011. He also reported having a prescription for Vicodin. According to the notes, he and his girlfriend went to check on her grandmother "down the road" after a storm and left the kids home alone "for maybe 15 minutes[,]" and he and his girlfriend were arrested and went to the Jefferson County jail for three days.

Ronald's drug tests results were admitted into evidence with tests on October 29, 2020, and November 30, 2020, being negative for drugs, and his December 31, 2020 test being positive for hydrocodone and hydromorphone. A hair follicle drug test on November 30, 2020, was cancelled for "insufficient specimen quantity[.]"

A report from Ronald's psychosocial assessment stated that he and Annie had been in a relationship for fifteen years and used drugs. According to the report, Ronald reported that he smoked marijuana and used cocaine and Annie used pills, methamphetamine, cocaine, and marijuana. Ronald reported he quit using drugs, but Annie continued to use them. He stated he had been in a relationship since November

12

2019 with his girlfriend who has a fourteen-year-old non-verbal autistic child who was placed in foster care and a six-year-old child who was living with the child's father. The report noted that Ronald had been arrested multiple times from 2005 to 2010 for multiple reasons including burglary of a building, and he "had a DWI in 2018[.]" According to the report, Ronald used marijuana at age nine and cocaine in 2006 to 2009 and last used drugs a year prior.

Issues

In issue one, Ronald challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that termination is in the children's best interest. Ronald's brief argues that "the record remains devoid of evidence" relevant to the children's best interest and that "[s]cant or paltry evidence is not sufficient." In issues two, three, and four, Ronald challenges the legal and factual sufficiency of the evidence supporting termination of Ronald's parental rights under sections 161.001(b)(1)(D), (E), and (O) of the Texas Family Code. Ronald argues there is no evidence that he placed the children with any dangerous person and no evidence that he himself endangered or neglected the children. He also argues that his incarceration alone is not sufficient to support termination on the grounds of endangerment.

Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001(b). Under the Family Code, "'[c]lear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction

14

about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* In cases tried to the bench, the trial court in its role as factfinder determines the credibility and weight of the witnesses' testimony and resolves any inconsistencies or conflicts in the evidence. *See Webb v. Crawley*, 590 S.W.3d 570, 578 (Tex. App.—Beaumont 2019, no pet.); *In re R.J.*, 568 S.W.3d 734, 754 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interests. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (applying previous version of the statute). Here, Ronald does not contest the predicate finding for termination under subsection N. Accordingly, we can affirm the termination on that ground alone. *See In re C.M.C.*, 554 S.W.3d 164, 171 (Tex. App.—Beaumont 2018, no pet.). However, Ronald challenges the endangerment findings, and given the potential future consequences of a finding under subsections D or E for a parent of a different child, we will also examine these grounds. *See In re N.G.*, 577 S.W.3d 230, 236-37 (Tex. 2019) (per curiam); *In re C.M.C.*, 554 S.W.3d at 171; *see also*

Tex. Fam. Code Ann. § 161.001(b)(1)(M) (providing a sufficient basis to terminate parental rights based on a previous section 161.001(b)(1)(D) or (E) finding).

Statutory Grounds D and E

Under subsection D, parental rights may be terminated if clear and convincing evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection E allows for termination of parental rights if clear and convincing evidence supports that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E).

Under subsection D, parental rights may be terminated based on a single act or omission by the parent. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)). Termination under subsection E requires more than a single act or omission, and a "'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* at 923 (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)). As for subsection D, we examine the time before the child's removal to determine whether the environment of the home posed a danger to the child's physical or emotional

well-being. *Id*. at 925 (citing *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)). "A finding of endangerment under subsection E, however, may be based on conduct both before and after removal." *In re A.L.H.*, 515 S.W.3d 60, 93 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (citing *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)). "'[E]ndanger' means to expose to loss or injury[.]'" *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Under subsection E, it is sufficient that the child's well-being is jeopardized or the child is exposed to loss or injury. *Boyd*, 727 S.W.2d at 533; *N.S.G.*, 235 S.W.3d at 367. "'A child is endangered when the environment creates a potential for danger that the parent is aware of, but disregards.'" *In re L.E.S.*, 471 S.W.3d at 925 (quoting *In re N.B.*, No. 06-12-00007-CV, 2012 Tex. App. LEXIS 3587, at **22-23 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.)). Generally, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

In addition, a history of drug abuse will support a finding of conduct endangering a child even if there is no evidence that such drug use caused a physical or actual injury to the child. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). A history

of illegal drug use is conduct that subjects a child to a life that is uncertain and unstable, endangering the child's physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). A parent's drug use, criminal history, and employment and housing instability prior to and during the case create a course of conduct from which the factfinder could determine the parent endangered the child's emotional and physical well-being. *See In re M.C.*, No. 09-18-00436-CV, 2019 Tex. App. LEXIS 2961, at **15-16 (Tex. App.—Beaumont Apr. 11, 2019, no pet.) (mem. op.); *see also In re S.R.*, 452 S.W.3d at 361-62 (parent's drug use may qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (illegal drug use may support termination under subsection E because "it exposes the child to the possibility that the parent may be impaired or imprisoned[]"). Further, a factfinder can reasonably infer that a parent's failure to submit to court-ordered drug tests indicated the parent was avoiding testing because he was using illegal drugs. *In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Allowing a child to live in unsanitary conditions supports a finding that the parent has endangered the child's physical and emotional well-being. *See In re A.T.*, 406 S.W.3d 365, 371-72 (Tex. App.—Dallas 2013, pet.

denied); *see also In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.) ("[A] child's exposure to continually unsanitary living conditions…may prove endangerment."). The child "need not develop or succumb to a malady due to th[e] [unsanitary] conditions before it can be said that" the child was endangered. *In re P.E.W.*, 105 S.W.3d at 777.

The trial court heard evidence that Ronald and his girlfriend would leave the children unsupervised and with Ronald's girlfriend's son who was violent toward the children. The court heard testimony that the children were found unsupervised, hungry, and not clean at the time of the removal. The court was presented with evidence that food was locked away so that the children at times had no access to food. The trial court heard evidence that Ronald and Annie had been giving one of the children the wrong dosage of medication and that the child had missed medical visits. The trial court heard evidence of Ronald's history of drug abuse and failure to submit to required drug testing and could have inferred it was because Ronald was using drugs. The trial court was presented with letters from the oldest of the four children, and the letters described how the children were emotionally and physically harmed while living with Ronald. The trial court heard the Caseworker's testimony that due to Ronald's constant traveling for work, she believed that if the children were returned home, the children would not be appropriately supervised. The trial court also heard the Caseworker's testimony that in her opinion Annie and Ronald

both knowingly placed or allowed the children to remain in conditions or surroundings which endangered their physical and emotional well-being and also engaged in conduct and placed the children with persons who engaged in conduct that endangered their physical and emotional well-being.

Deferring to the trial court's credibility determinations and reviewing all the evidence in the light most favorable to the termination findings under subsections D and E, the trial court could reasonably have formed a firm belief or conviction that Ronald, through his individual acts or omissions or a course of conduct, endangered the children's physical or emotional well-being. We conclude that the Department established, by clear and convincing evidence, that Ronald committed the predicate acts enumerated in subsections D and E. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Further, considering the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment findings is not so significant that the court could not reasonably have formed a firm belief or conviction that Ronald endangered the children. *See In re J.F.C.*, 96 S.W.3d at 266.

### Best Interest of the Child

In issue one, Ronald challenges the legal and factual sufficiency of the evidence to support the trial court's finding that terminating Ronald's parental rights was in the children's best interest. Trial courts have wide latitude in determining a

child's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). There is a strong presumption that the best interest of a child is served by keeping the child with his parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also* Tex. Fam. Code Ann. § 153.131(b). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a).

The Family Code outlines nonexclusive factors to be considered in determining whether a parent is willing and able to provide a safe environment for a child including: the child's age and physical and mental vulnerabilities; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.*

§ 263.307(b); *see also In re R.R.*, 209 S.W.3d at 116. The Texas Supreme Court has articulated several additional factors that may be considered when determining whether termination of parental rights is in the best interest of the child, including: the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (setting forth the "*Holley* factors" and noting "[t]his listing is by no means exhaustive[]"). No specific *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child.") (citing *In re C.H.*, 89 S.W.3d at 27); *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.— Dallas 2006, no pet.). Because stability and permanence are important in a child's emotional and physical development, termination of parental interests may be in the

22

child's best interest when a parent is unable to provide a stable environment or a reliable source for food, clothing, shelter, and emotional support. *See In re J.D.*, 436 S.W.3d 105, 119-20 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied)); *In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

A parent's past conduct is relevant to determining the parent's present and future ability to care for a child. *See In re C.H.*, 89 S.W.3d at 28 (parent's past performance as parent is relevant to determination of present and future ability to provide for child); *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (factfinder may measure a parent's future conduct by past conduct); *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.). The best-interest determination may rely on direct or circumstantial evidence, subjective factors, and the totality of the evidence. *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). If, in light of the entire record, no reasonable factfinder could form a firm belief or conviction that termination was in the child's best interest, then we must conclude that the evidence is legally insufficient to support termination. *See In re J.F.C.*, 96 S.W.3d at 266.

As for the desires of the children, the trial court heard the Caseworker's testimony that the two older children had expressed to her that they wanted to stay with their aunt and uncle, and that although the two younger children expressed the

23

desire to go home, the Caseworker learned that Annie had coerced the children to say that. The trial court read letters from Linda, the oldest child, asking for the court to allow the children to stay with the aunt and uncle where Linda said they are safe and their needs are met. This factor weighs heavily in favor of terminating Ronald's parental rights.

Regarding the children's emotional and physical needs now and in the future, and the possible emotional and physical danger to them now and in the future, the record includes testimony that the children were being denied access to food, left unsupervised, left with the girlfriend's son who was a violent child, and subjected to an unstable home life. The trial court was presented with Linda's letters that explained how Ronald's home was not meeting the children's physical and emotional needs. The trial court was entitled to find that this factor weighed in favor of termination.

As to the parental abilities of the parent seeking custody, the evidence showed that although Ronald had completed his parenting classes, he had not submitted to all drug testing and had not provided proof of attending the recommended counseling and support group. The trial court heard the Caseworker's testimony that due to Ronald's constant traveling for work, she believed that if the children were returned home that they would not be appropriately supervised. The trial court read Linda's letters that stated that the children had not seen Ronald in five months during the

pendency of the case, and the trial court heard the Caseworker's testimony that Ronald's visits with the children were sporadic. The trial court heard evidence of Ronald's criminal history and history of drug abuse. This factor weighs in favor of terminating Ronald's parental rights.

Regarding the plans for the children, the trial court heard the Caseworker's testimony that the children were doing well in their current placement with the children's aunt and uncle. The trial court was presented with evidence that the children had spent significant time at the aunt's house prior to their removal and that they were well-bonded with their aunt and uncle. The trial court heard evidence that the children were growing and receiving appropriate medical care in the aunt and uncle's home. The trial court heard evidence from the children's aunt that she and her husband were willing to adopt the children. This factor weighed in favor of terminating parental rights.

Regarding Ronald's acts or omissions, evidence showed that Ronald has a criminal history and history of drug abuse. He failed to submit to all drug testing during the pendency of the case, and the trial court could have inferred that he was continuing to use drugs. Ronald failed to provide proof of a stable and safe home. The evidence showed that Ronald and his girlfriend denied the children access to food and left them unsupervised and with a violent child. The trial court heard evidence that Ronald and his girlfriend had been arrested for trespassing and

25

incarcerated at the time of the children's removal. On this record, we conclude the trial court could have reasonably found that Ronald's acts and omissions weigh heavily in favor of terminating Ronald's parental rights.

Having considered the evidence related to best interest and deferring to the trial court's determinations on witness credibility, the resolution of conflicts in the evidence, and the weight to be given the testimony, we conclude that the statutory and *Holley* factors weigh in favor of the trial court's finding that termination is in the children's best interest. *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307(a); *In re J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72. We conclude that the evidence is both legally and factually sufficient to support the trial court's finding that termination of Ronald's parental rights is in the children's best interest.

Having overruled Appellant's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on November 22, 2021
Opinion Delivered January 20, 2022

Before Kreger, Horton and Johnson, JJ.

26